# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### ATHENS DIVISION

**HARVEY ELLIS STEWART, III** :
:
    **Plaintiff,** :
:    **No. 3:18-CV-129 (CAR)**
**v.** :
:
**CITY OF GREENSBORO, GEORGIA,** :
:
    **Defendant.** :
_____ :

## ORDER ON MOTION FOR SUMMARY JUDGMENT

Plaintiff Harvey Ellis Stewart, III brings this action for violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, alleging Defendant the City of Greensboro, Georgia ("the City") failed to compensate him for overtime and terminated him in retaliation for complaining about his lack of pay. Stewart also alleges the City violated Georgia law for breach of contract; intentional infliction of emotion distress; and negligent hiring, supervision, and retention of then-Chief of Police Ossie Mapp. Before the Court is the City's Motion for Summary Judgment. Having read and considered the Motion, the record in this case, the applicable law, and the parties' arguments, the Court **HEREBY GRANTS IN PART** and **DENIES IN PART** the City's Motion for Summary Judgment [Doc. 15]. Specifically, the Court **DENIES** summary judgment for the City on Stewart's claims for failure to pay overtime and retaliation under the FLSA, and **GRANTS** summary judgment for the City on Stewart's state law claims for breach of

1

contract; intentional infliction of emotional distress; and negligent hiring, supervision, and retention.

## LEGAL STANDARD

Summary judgment is proper if the movant "shows that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law."[1] Not all factual disputes render summary judgment inappropriate; only a genuine issue of material fact will defeat a properly supported motion for summary judgment.[2] This means that summary judgment may be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict.[3]

On summary judgment, the Court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party; the Court may not make credibility determinations or weigh the evidence.[4] The moving party "always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law.[5] If

---

[1] Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
[2] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).
[3] *See id.* at 249-52.
[4] *See id.* at 254-55; *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).
[5] *Celotex*, 477 U.S. at 323 (internal quotation marks omitted).

the moving party discharges this burden, the burden then shifts to the nonmoving party to respond by setting forth specific evidence in the record and articulating the precise manner in which that evidence creates a genuine issue of material fact or that the moving party is not entitled to a judgment as a matter of law.[6] This evidence must consist of more than mere conclusory allegations or legal conclusions.[7]

## BACKGROUND

The City employed Stewart as a police officer in its Police Department from 2011, until Chief of Police Ossie Mapp terminated him on September 11, 2017. Stewart contends Chief Mapp unlawfully altered his timesheets, failed to properly pay him overtime compensation, and fired him in retaliation for complaining about the failure to properly compensate him. After Chief Mapp fired him, Stewart met with the City Manager, Larry Postell, and contends he and Postell reached a verbal agreement that in exchange for Stewart's voluntary resignation, Stewart would not pursue legal action against the City, and the City would pay him two weeks of pay and report the separation of his employment to the Georgia Peace Officer Standards and Training Council ("POST") as voluntary. Stewart, however, never received two weeks of pay, and the City reported to POST that Stewart resigned in lieu of termination, causing him to suffer extreme stress. The City denies Stewart's allegations. The City contends it appropriately compensated

---

[6] *See* Fed. R. Civ. P. 56(e); *see also Celotex,* 477 U.S. at 324-26.
[7] *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).

Stewart for all of the hours he worked, but even if it did fail to pay him some overtime, any such amount is negligible and should be disregarded. The City states it terminated Stewart due to his racist remarks on several occasions, and any agreement with the City Manager is not binding on the City. The facts, taken in the light most favorable to Stewart as the nonmoving party are as follows:

**Stewart's Duties and Work Hours with the City's Police Department**

On June 13, 2011, the City hired Stewart as a patrol officer in its Police Department. Almost immediately thereafter, he was promoted to Corporal, and in late October 2013, he was promoted to Lieutenant, the position he held until his employment ended in September 2017. Stewart reported directly to Sergeant Randy Barnhart, who reported to Captain Rodricus Monford. Captain Monford, in turn, reported to Chief Ossie Mapp, who held the highest position of authority at the Police Department throughout Plaintiff's employment.[8]

Throughout Stewart's employment (other than for a brief period in 2015), he was generally scheduled to work twelve-hour rotating shifts (6:00am to 6:00pm) of 36 and 48 hour weekly schedules, in which one week he would work Wednesday, Thursday, and Monday, and the next week he would work Tuesday, Friday, Saturday, and Sunday.[9] Thus, Stewart was generally scheduled to work 168 hours every 28 days. The City paid

---

[8] Stewart Aff. ¶¶6,7 [Doc. 18-4].
[9] *Id.* at ¶ 15.

him weekly.[10] Like all employees, Stewart clocked in and out each workday using the Police Department's fingerprint scan system.[11] Stewart did not separately record his hours apart from clocking in and out using the Police Department's fingerprint scan system.

The majority of Stewart's duties consisted of patrolling the City and responding to calls. The calls were often scheduled at or near the end of a shift, and Stewart testified that he was not always able to immediately end his shifts on the scheduled time.[12] Stewart testified that Chief Mapp explicitly directed him to perform other duties, which included transporting Chief Mapp for Chief Mapp's personal matters and attending community events such as church events/services, municipal court proceedings, career expositions, and others.[13]

Stewart consistently received positive performance reviews, pay raises, and bonuses throughout his employment. From 2013 through 2016, he received "meet and exceed expectations" ratings on his performance reviews.[14] In 2015, his performance evaluation stated, "Pleasure to have on the team!" and "Works well with others." On August 10, 2016, Stewart received his first reprimand for failing to exercise patience and displaying sarcasm when he responded to a call.[15] Stewart states that he received a verbal

---

[10] *Id.* at ¶ 25.
[11] *Id.* at ¶ 26.
[12] *Id.* at ¶¶12, 15.
[13] *Id.* at ¶¶16, 17.
[14] *Id.* at ¶8.
[15] *Id.*

reprimand, not a written reprimand, for this incident.[16] Nonetheless, he received a "meet and exceed expectations" for his last performance review for June 2016 to December 2016.[17] Stewart was compensated on an hourly basis and received a 3% raise in 2016 and another 3% raise in 2017.[18]

**The City's Overtime Procedures**

At all relevant times, the Police Department employed a 28-day work period for sworn officers, including Stewart. For each 28-day work period, an officer was paid for 40 hours of work for the first three weeks, and 51 hours for the fourth week, totaling 171 hours.[19] The City was required to pay overtime compensation for the hours each officer worked over 171 within the 28-day work period.[20] If an employee took any type of leave during the work period, such as sick or vacation leave, then that leave time did not count toward hours worked for calculating overtime during that work period.[21] The City paid all overtime on the fourth week.

Either Captain Monford or Chief Mapp was supposed to approve Stewart's overtime, and Stewart was required to submit an overtime sheet for the overtime hours he worked.[22] Each week on Tuesday mornings, Chief Mapp's administrative assistant,

---

[16] *Id*.at ¶ 41.
[17] *Id.*
[18] *Id.* at ¶ 11.
[19] Fleeman Decl. ¶6 [Doc. 15-8]; Saunders Decl. ¶6 [Doc. 15-6].
[20] Mapp. Decl. ¶3 [Doc. 15-5]; Saunders Decl. ¶3; Postell Decl. ¶ 5 [Doc. 15-4]; Fleeman Decl. ¶6.
[21] Fleeman Decl. ¶6; Postell Decl. ¶5.
[22] Stewart Depo. pp. 171-72 [Doc. 17].

Tramekia Saunders, printed out the reports from the fingerprint scanning system, referred to as the "detailed payroll reports," and she would go through them to make sure they were accurate and complete.[23] Occasionally, Saunders would go into the fingerprint scanning system and edit any clock-in or clock-out time that was missing or add in paid leave that an employee took in a given week, such as sick leave, vacation leave, or a paid holiday.[24] Saunders would also cross-reference the detailed payroll reports with any overtime sheets that employee had submitted.[25] She would provide the detailed payroll reports and the overtime sheets to Chief Mapp for approval (or to Captain Monford in the Chief's absence). When he reviewed the reports, Chief Mapp would reduce time when an officer failed to submit an overtime sheet, failed to obtain approval for overtime, or failed to clock out for several minutes when an employee finished working his or her shift.[26]

After Chief Mapp or Captain Monford approved the detailed payroll reports, an employee would deliver the reports to Billing and Payroll Clerk Jolene Fleeman for processing.[27] For each 28-day work period, Fleeman calculated by hand whether an employee had earned overtime, and she maintained those calculations as part of her

---

[23] Saunders Decl. ¶ 5 [Doc. 15-6].
[24] *Id.*
[25] *Id.*
[26] Mapp Decl. ¶ 7 [Doc. 15-5].
[27] Saunders Decl. ¶5; Fleeman Decl. ¶4.

duties as Payroll and Billing Clerk, including her calculations for whether Stewart earned overtime in 2015, 2016, and 2017.

## Stewart's Overtime Hours and Complaints

Stewart claims Chief Mapp routinely reduced his hours to 171 per work period to avoid paying him overtime.[28] Moreover, Stewart claims that Chief Mapp explicitly told him at times not to submit an overtime sheet or account for certain events Chief Mapp required him to attend.[29] Chief Mapp specifically told Stewart to clock out at his scheduled shift-end times even though Stewart was required to attend community events that lasted beyond his shift.[30] Even when Chief Mapp allowed Stewart to submit his overtime sheet, Stewart was only compensated for some, but not all, of the time he was required to work.[31] Corporal Randy Barnhart also stated that he "regularly experienced discrepancies in [his] time records," and the "time records maintained by Chief Mapp . . . always contained fewer hours that the hours [he worked]."[32] Likewise, employee Kasey Coile believed that he was not properly compensated for the hours he worked attending community events, and Chief Mapp "explicitly instructed [him] not to clock in for the hours [he] had to be present for community meetings and dinners."[33]

---

[28] Stewart Aff. ¶¶15-24; 28-31.
[29] Stewart Aff ¶ 21; Stewart Depo. pp. 167-69, 301-02.
[30] Stewart Depo. pp 302-03; 326.
[31] Stewart Aff. ¶ 19; Stewart Depo. p. 172.
[32] Barnhart Decl. ¶¶7,8 [Doc. 18-5].
[33] Coile Decl. ¶¶ 7-11 [Doc.18-6].

In 2015, Stewart submitted three overtime sheets requesting a total of 21 hours of overtime for which he was only paid for 7.5 hours.[34] In 2016, Stewart submitted eight overtime requests for a total of 43.5 overtime hours for which he was paid for none.[35] Likewise, in 2017, Stewart submitted five overtime requests for a total of 64 overtime hours for which he was paid for none.[36] Stewart testified that he generally worked well in excess of 171 hours per month but was never compensated. Stewart states the approximately three to four months prior to his termination on September 11, 2017, he worked an excessive number of hours off the clock due to Captain Monford's absence.[37]

Stewart's detailed payroll reports for the relevant weeks in 2015, 2016, and 2017 show that he did, in fact, earn and receive payment for overtime he worked—receiving overtime in three 28-day work periods in 2015, three in 2016, and four in 2017.[38] The reports, however, also show that Chief Mapp physically altered the number of hours he worked for a total of 23 pay periods from 2015 through 2017—three in 2015, thirteen in 2016, and seven in 2017.[39] On these reports, Chief Mapp struck through and/or whited-out certain numbers and wrote in a reduced number of hours for which Stewart was paid. Stewart and Corporal Barnhart personally witnessed Chief Mapp physically crossing out and whiting out employee timesheets as they were transporting the timesheets to City

---

[34] Stewart Aff. ¶ 20; Stewart Depo. Exs. 20, 27.
[35] *Id.*
[36] *Id.*
[37] Stewart Aff. ¶¶ 27-8; Stewart Depo. p. 297.
[38] Fleeman Decl. ¶ 26 [Doc. 15-8].
[39] Stewart Depo. pp. 80-81 [Doc. 17]; Fleeman Decl. ¶¶4-5.

Hall for processing.[40] Had Chief Mapp not reduced Stewart's hours in the relevant weeks in 2015, 2016, and 2017, Stewart would have been entitled to less than one additional hour of overtime.[41] Chief Mapp states that he made these changes because Stewart failed to submit the requested overtime sheet, or overtime was not approved, or he had finished working his shift but failed to clock out for several minutes.[42]

Stewart states that throughout his employment he repeatedly complained to several City employees, including Chief Mapp, Captain Tommy Nelson, Captain Monford, City Manager Larry Postell, and City Council Members Chris Moore and Mott Miller, about the unlawful reduction of his hours and for the unaccounted hours.[43] No one took any action to address his complaints.[44] Chief Mapp told Stewart the community events were part of his assigned duties, and Stewart would not be compensated for them.[45] Other times, Chief Mapp repeatedly chastised and threatened to terminate Stewart's employment if he continued to complain. On one occasion, Chief Mapp explicitly told Stewart, "If you don't keep your mouth shut, your mouth is going to get you fired."[46] When Stewart inquired about the method the City used to pay Police Department employees and to calculate the hours worked, Chief Mapp told Stewart he

---

[40] Stewart Aff. ¶ 29; Stewart Depo. pp. 85-86; Barnhart Decl. ¶¶ 8-9 [Doc. 18-5].
[41] Fleeman Decl. ¶ 24.
[42] Mapp Decl. ¶ 7.
[43] Stewart Aff. ¶¶ 22, 24, 32; Stewart Depo. pp. 70, 74, 79, 161, 210-12, 324-25.
[44] Stewart Aff. ¶¶ 22-24; Stewart Depo. p. 211.
[45] Stewart Aff. ¶¶ 15-18.
[46] Stewart Aff. ¶¶ 23, 33; Stewart Depo. pp. 70, 147-48.

was generally entitled to pay for up to 171 hours per 28 days, and Chief Mapp was allowed to do "whatever [he] want[ed] to do."[47] Captain Monford also dismissed Stewart's complaints and stated that Stewart was required to comply with the Chief's orders.[48]

**<u>Stewart's Alleged Use of Racial Slurs</u>**

The City contends Chief Mapp legitimately terminated Stewart after three incidents during his tenure in which he used racial slurs. The first incident occurred sometime between 2012 and 2013. Stewart, a corporal at the time, and two patrol officers—Tyrone Janes and Tony Black (African American)—were working the night shift together and had just arrested a local citizen Will Ingram, who was known as the "town drunk."[49] At some point, Stewart said out loud to Black and Janes, "Will is nothing but a fucking nigger."[50] Stewart adamantly denies these allegations.[51] Stewart does admit that he said the phrase "nigga please" in front of Janes and Black and then apologized to Black because he knew he should not have used that phrase.[52]

The second alleged incident occurred two to three years later, on July 10, 2016. Patrol officer Demone Clark (African American) received a group text message, also sent to employee Kasey Coile (Caucasian) and an old cell phone number for patrol officer

---

[47] Stewart Aff ¶ 27; Stewart Depo. p. 160.
[48] Stewart Aff. ¶ 23; Stewart Depo. 70.
[49] Jones Decl. ¶4 [Doc. 15-9].
[50] *Id*.
[51] Stewart Aff. ¶¶ 13-14; Stewart Depo. pp. 101-102.
[52] Stewart Depo. pp. 103-04.

Ricky Brown (African American).[53] Clark believed Stewart sent the message, as it came from a cell phone number Clark believed to belong to Stewart.[54] The message included a picture of a smiling white pit bull with the words, "When a nigga's getting loud with you & talkin reckless not knowin you got hands & will end his bitch ass life" written across the picture, together with a personal text message that stated "Thought of you, Demone," and included three emojies.[55] After receiving the message, Clark complained to Brown and Ray Harris, both patrol officers at the time, and saved the messages.[56] Stewart denies sending these text messages.[57] In fact, Stewart states that he never had any personal relationship with Clark outside of work and only communicated with Clark for work-related reasons.[58]

The third and final incident occurred in late August 2017, a few weeks before Chief Mapp terminated Stewart. Patrol officers Jonathan Thomas and Demone Clark (both African American) and Stewart were in the squad room at the Police Department, and it was close to the end of their shift.[59] Clark and Thomas were discussing a recent shooting in which a Caucasian deputy sheriff with the Greene County Sheriff's Office shot an African-American suspect.[60] Stewart joined the conversation and stated that if Clark or

---

[53] Clark Decl. ¶ 4 [Doc. 15-10].
[54] *Id.*
[55] *Id.*
[56] *Id.*at ¶5.
[57] Stewart Aff. ¶¶39-40; Stewart Depo. pp. 118-119.
[58] *Id.*
[59] Clark Decl. ¶6.
[60] *Id.*

Thomas were to shoot a black person, they would be labelled an "Uncle Tom," whereas if Stewart were to shoot a black person, he would be called a "Nigger Shooter" or "Nigger Killer."[61] Clark complained to Corporal Ricky Brown that Stewart had used the phrase "Nigger Killer."[62] Brown then called Thomas to confirm that Stewart had used a racial slur and asked Clark and Brown to write statements summarizing the incident, which Brown received on August 30, 2017.[63] In his statement, Clark also mentioned the text message he believed he received from Stewart the year before with the picture of the pit bull. Brown provided the statements to Chief Mapp.[64] Stewart denies using the phrase "Nigger Shooter" or "Nigger Killer."[65]

**Stewart's Termination and Meeting with the City Manager**

Chief Mapp reviewed patrol officers Clark's and Thomas's statements regarding the third incident and met with Corporal Brown, Thomas, and Clark.[66] Chief Mapp then determined that Stewart's employment should be terminated.[67] On September 11, 2017, Chief Mapp called Stewart, Captain Nelson, and Sergeant Latravis Baugh for a meeting.[68] Upon entering the office, Chief Mapp stated, "I guess you guys are all wondering why you are here. Let's start with Lieutenant Stewart, you are fired for being a racist. Turn in

---

[61] *Id.*
[62] Clark Decl. ¶7; Brown Decl. ¶¶4-5 [Doc. 15-7].
[63] Brown Decl. ¶¶4-5.
[64] Clark Decl. ¶7.
[65] Stewart Aff. ¶¶ 13-14; Stewart Depo. pp. 108-110.
[66] Mapp Decl. ¶10.
[67] *Id.*
[68] Stewart Depo. p. 130.

your gun and badge."[69] Stewart repeatedly asked for an explanation and denied using any racial slur or sending a racist text.[70] Chief Mapp testified that he found Brown, Thomas, and Clark more credible[71]. Stewart was given a disciplinary action notice stating that he had violated the City of Greensboro Police Department Operations Manual's section on conduct unbecoming an officer.[72]

Immediately after his meeting with Chief Mapp, Stewart went to City Manager Larry Postell's office. Stewart informed Postell that Chief Mapp had terminated him and complained that he had been treated unfairly and in a discriminatory manner, and Chief Mapp was targeting him.[73] Stewart stated that he and Postell verbally agreed that in exchange for Stewart voluntarily resigning from employment and not pursuing legal action, Stewart would receive two weeks of pay and his separation would be reported to POST as a voluntary resignation.[74] Postell drafted Stewart's resignation letter and both of them signed it. Stewart states he left City Hall with a copy of his signed Separation Notice stating that he resigned voluntarily.[75] Stewart did not receive two weeks of pay, and the City reported to POST that Stewart resigned "in lieu of termination."[76]

---

[69] Stewart Aff. ¶¶34-35; Stewart Depo. p. 130.
[70] *Id.*
[71] Mapp Decl. ¶ 11.
[72] *Id.*
[73] Stewart Aff. ¶¶42, 45; Stewart Depo. p. 142.
[74] Stewart Aff. ¶ 45; Stewart Depo. p. 144.
[75] Stewart Aff. ¶ 46; Stewart Depo. pp. 143-45, 157-58, 261-62.
[76] Stewart Aff. ¶ 48; Stewart Depo. pp. 27, 225.

After his separation, Stewart obtained a copy of his personnel file from the City, which contained, among other things, (1) a screenshot of a text message allegedly sent from Stewart to Clark, Kasey Coile, and Ricky Brown; (2) statements from Clark and Brown stating that Stewart allegedly used the word "nigger"; and (3) a written reprimand from August 10, 2016. Stewart denies the racial incidents and states that he received a verbal, not written, reprimand from the August 10, 2016 incident. Stewart contends he never signed the written Disciplinary Action form in his file. He contends the form was forged, as it was placed in his file after his separation, and it appears someone whited-out the checkmark on the Verbal Reprimand line, as the line on the Written Reprimand section does not match.[77]

Stewart filed suit against the City alleging violations of the FLSA for failure to pay overtime and retaliation, and violations of Georgia state law for breach of contract; intentional infliction of emotional distress; and negligent hiring, retention, and supervision. The City has moved for summary judgment on all claims.

## DISCUSSION

### I.     FLSA Claims

#### A.  Failure to Pay Overtime

The City first contends that any hours Stewart worked in excess of 171 per 28-day work period were de minimus and may therefore be disregarded. Even if the hours are

---

[77] Stewart Aff. ¶ 41.

not de minimus, the City argues its conduct was not willful as a matter of law, and therefore Stewart's claim should be limited to FLSA's two-year statute of limitations, not three years, and Stewart is not entitled to liquidated damages. The Court is unpersuaded and finds genuine issues of material fact exist as to both the amount of overtime hours Stewart worked and the City's willfulness.

### i. Amount of Hours Worked

The FLSA provides that employers generally must pay non-exempt employees overtime pay at one and one-half times the employees' regular rate for over 40 hours worked per week.[78] Police departments and other public agencies are partially exempt from this requirement under 29 U.S.C. § 207(k), commonly known as the 7(k) exemption. Specifically, the 7(k) exemption permits police departments and other public agencies to require their employees to work a greater number of hours per week before the employees become entitled to overtime compensation. A public agency invoking the 7(k) exemption must establish a "work period" of at least 7 but nor more than 28 days.[79] "The work period concept was intended to ease the overtime burdens of certain public employers by allowing them to average their employees' duty hours over the designated work period, from seven to twenty-eight days in length."[80] "[T]he work period can be of

---

[78] *See* 29 U.S.C. § 207(a)(1)

[79] 29 U.S.C. § 207(k)(2).

[80] *Avery v. City of Talladega*, 24 F.3d 1337, 1244 (11th Cir. 1994).

any length, and it need not coincide with the duty cycle or pay period."[81] The parties do not dispute that the 7(k) exemption applies here, as the City required its police officers in the patrol division, including Stewart, to work a regularly recurring 28-day work period and paid its officers overtime compensation for any hours worked over 171 hours.[82]

The City argues that Stewart's contentions that he worked uncompensated overtime hours are just vague, conclusory statements that have no evidentiary value: He has produced no records and no credible testimony providing information as to when he worked those hours, how often worked those hours, or how long he worked those hours. In contrast, the City argues it has produced accurate time records accounting for the hours Stewart worked on each day. Even if Chief Mapp improperly struck some of Stewart's hours on his time records,[83] and the City failed to pay him overtime during a particular 28-day work period, such amount was de minimus and should be disregarded; thus, summary judgment for the City is appropriate. The Court disagrees. Because genuine issues of material fact exist as to the number of hours Stewart worked and did not get paid, such determination must be left to a jury.

"Although a FLSA plaintiff bears the burden of proving that he or she worked overtime without compensation, '[t]he remedial nature of this statute and the great public

---

[81] *Birdwell v. City of Gadsden*, 970 F.2d 802, 806 (11th Cir. 1992) (internal quotation marks and citation omitted).

[82] Mapp Decl. ¶3; Saunders Decl. ¶ 3; Postell Decl. ¶5; Fleeman Decl. ¶6.

[83] Mapp states he reduced the hours because he believed Stewart was not actually working the time or Stewart failed to get his overtime approved.

policy which it embodies . . . militate against making that burden an impossible hurdle for the employee.'"[84] The employer has a duty to keep records of an employee's wages and hours because "[t]he employer is in a superior position to know and produce the most probative facts concerning the nature and amount of work performed[.]"[85] "Employees seldom keep records themselves."[86] "[I]n situations where the employer's records cannot be trusted and the employee lacks documentation, the Supreme Court held "that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extend of that work as a matter of just and reasonable inference."[87] The burden then shifts to the employer, and "it must bring forth either evidence of the precise amount of work performed or evidence to negate the reasonableness of the inference to be drawn from the employee's evidence."[88] "If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result may only be approximate."[89]

Stewart's testimony casts sufficient doubt on the City's contention that its records accurately reflect that the hours Stewart worked in excess of 171 hours per work period

---

[84] *Allen v. Board of Public Educ. for Bibb County*, 495 F.3d 1306, 1315 (11th Cir. 2007) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)).

[85] *Id.*

[86] *Id.*

[87] *Id.* at 1316. (internal quotation marks and citation omitted).

[88] *Id.*

[89] *Id.* (internal quotation marks and citation omitted).

were de minimus. Stewart testified that he was required to respond to calls that were scheduled at or near the end of his shift that required him to work in excess of his scheduled hours; he was required to perform duties out of his scheduled shift that included driving Chief Mapp for his personal matters and attending community events, such as church events, municipal court proceedings, career expositions, and festivals; Chief Mapp explicitly directed him not to account for or keep track of such hours; Chief Mapp struck hours he worked, specifically told him to clock out at his scheduled shift end times knowing he required Stewart to continue working, and failed to pay Stewart proper overtime.

Stewart's testimony is corroborated by employee Kasey Coile's and Corporal Barnhart's testimonies. Coile stated that Chief Mapp required him to attend community events on at least one or two occasions per month, and provide security and perform courtroom-related duties at municipal court for which he was not properly compensated because Chief Mapp explicitly instructed him not to clock in for such hours.[90] Likewise, Corporal Barnhart testified that that his timesheets reflected fewer hours than those he actually worked, and when he asked Chief Mapp why he was not getting paid for the full hours he worked, Chief Mapp responded that "he didn't have to pay me for such hours" or that "he didn't have to pay me because I worked unauthorized overtime."[91]

---

[90] Coile Decl. ¶¶ 7, 9, 10, 11.
[91] Barnhart Decl. ¶¶ 8, 11 [Doc. 18-5].

Stewart's testimony is further bolstered by the City's records themselves showing that between September 2015 and September 2017, Stewart submitted 16 overtime request sheets, requesting 128 hours of overtime for which he was paid for only 7.5 hours. Moreover, Stewart and Corporal Barnhart both testified that they witnessed Chief Mapp striking through or whiting out listed hours for employees thereby reducing them so as not to pay overtime. Although Stewart can produce no documentation showing precisely the amount of overtime hours he worked that the City failed to pay him, he has produced "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference."[92] Thus, Stewart's claim for overtime compensation survives summary judgment.

**Willfulness: Statute of Limitations and Liquidated Damages**

The City argues that the statute of limitations for Stewart's claims should be limited to two years, and Stewart cannot seek liquidated damages, because he cannot establish the City willfully violated the FLSA. Ordinarily, when a defendant violates the FLSA, a plaintiff may recover wages worked for two years; however, when the defendant willfully violates the FLSA, the plaintiff may recover wages worked for three years.[93] In addition, a plaintiff is not entitled to liquidated damages unless he can show that the FLSA violation is willful.[94] To establish a willful violation, the plaintiff must prove "his

---

[92] *Allen*, 495 F.3d at 1318.

[93] *Allen v. Bd. of Public Educ. for Bibb Cnty*, 495 F.3d 1306, 1323-24 (11th Cir. 2007) (citing 29 U.S.C. § 255(a)).

[94] 29 U.S.C. § 255(a).

employer either knew that its conduct was prohibited by the statute or showed reckless disregard about whether it was."[95] The plaintiff bears the burden to prove the employer's conduct was willful.[96]

Stewart testified that he complained multiple times to multiple City employees including Chief Mapp, Captain Nelson, Captain Monford, City Manager Postell, and two City Council members. He stated that his complaints were not only seemingly dismissed but also overtly quashed, and Chief Mapp even threatened termination if he continued to complain. The FLSA defines "employ" as "to suffer or permit to work."[97] The regulations caution that "[w]ork not requested but suffered or permitted is work time."[98] "The reason an employee continues to work beyond his shift is immaterial; if the employer knows or has reason to believe that the employee continues to work, the additional hours must be counted."[99] Moreover, "[t]he mere promulgation of a rule against such work is not enough. Management has the power to enforce the rule and must make every effort to do so."[100] Here, if the jury finds Stewart did, in fact, work excess overtime hours, the record does not indicate that the City did anything to discourage the overtime. On the contrary, Stewart testified that Chief Mapp required him to work the

---

[95] *Alvarez Perez*, 515 F.3d at 1162-63 (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)).

[96] *See, e.g., Davis v. Friendly Express, Inc.*, 61 F. App'x 671 (11th Cir. 2003) (per curiam) ("Generally, a FLSA Plaintiff carries the burden of proving all elements of a FLSA claim.").

[97] 29 U.S.C. § 203(g).

[98] 29 C.F.R. § 785.11.

[99] *Reich v. Dept. of Conservation & Nat'l Resources*, 28 F.3d 1076, 1082 (11th Cir. 1994) (citing 29 C.F.R. § 785.11).

[100] 29 C.F.R. § 785.13.

overtime and specifically informed Stewart he would not get paid. If the jury finds that the City failed to pay Stewart overtime, sufficient evidence exists to support a finding such violation of the FLSA was willful.

### B. FLSA Retaliation

The FLSA protects persons against retaliation for asserting their rights under the statute.[101] Section 215(a)(3) provides, in pertinent part, that "it shall be unlawful for any person . . . to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this [Act][.]"[102] To prevail on such a claim, a plaintiff must ultimately prove that "the 'immediate cause' of [his] discharge [was] retaliation."[103] "The anti-retaliation provision of the FLSA was designed to prevent fear of economic retaliation by an employer against an employee who chose to voice such a grievance."[104] This can be done through either direct or circumstantial evidence.[105]

Although Stewart does not present any direct evidence to prove retaliation,[106] he does present sufficient circumstantial evidence to survive summary judgment. When a

[101] 29 U.S.C. § 215(a)(3) ("[I]t shall be unlawful for any person . . . to discharge or in any other manner discriminate against any employee because such employee has filed any complaint.").
[102] 29 U.S.C. § 215(a)(3).
[103] *Reich v. Davis*, 50 F.3d 962, 965 (11th Cir. 1995) (citation omitted).
[104] *E.E.O.C. v. White & Son Enterprises*, 881 F.2d 1006, 1011-12 (11th Cir. 1989).
[105] *See Morgan v. Kalka & Baer LLC*, 750 F. App'x 784, 787 (11th Cir. 2018) (*per curiam*).
[106] Despite Stewart's contentions otherwise, Chief Mapp's threats to terminate Stewart's employment if he continued to complain about his overtime does not constitute direct evidence because no evidence shows when Stewart complained or when Chief Mapp made such threats. *See Williamson v. Adventist Health Sys/Sunbelt, Inc.*, 372 Fed. Appx. 936, 940 (11th Cir. 2010) ("To qualify as direct evidence of discrimination, we require that a biased statement by a decision-maker be *made concurrently with the adverse employment*

plaintiff relies on circumstantial evidence, it "may be evaluated under the burden-shifting framework [first] articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)."[107] Under this framework, the plaintiff bears the initial burden of establishing a *prima facie* case of FLSA retaliation.[108] If the plaintiff succeeds, "the burden shifts to the employer to proffer a legitimate reason for the adverse action. If the employer offers a legitimate reason, the plaintiff must then establish that the proffered reason was pretextual."[109]

Once the plaintiff establishes a *prima facie* case, "the employer has the burden to produce a lawful basis for the employment action. The plaintiff must then produce evidence to show that the employer's proffered basis is pretextual. If the plaintiff cannot, the defendant is entitled to summary judgment."[110] To demonstrate pretext, the plaintiff must do more than simply question the defendant's business decision, as "[a] plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer."[111] Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head

---

*event*, such that no inference is necessary to conclude that the bias necessarily motivated the decision." (citations and quotation marks omitted)).

[107] *Raspanti v. Four Amigos Travel, Inc.*, 266 F. App'x 820, 822 (11th Cir. 2008).

[108] *Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1343 (11th Cir. 2000)

[109] *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1314 (11th Cir. 2018).

[110] *Wigfall v. St. Leo Univ., Inc.*, 517 F. App'x 910, 912 (11th Cir. 2013).

[111] *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000).

on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason."[112]

### i. *Prima Facie* Case

Stewart has established a *prima facie* case of retaliation. A *prima facie* case of FLSA retaliation requires Stewart to show (1) he engaged in an activity protected by the FLSA; (2) he subsequently suffered an adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action.[113] The City does not dispute, for purposes of summary judgment, that Stewart meets the first two prongs. The City contends Stewart cannot establish a causal connection between his complaints and termination.

To establish a causal connection, Stewart must show that "the adverse action would not have been taken 'but for' the assertion of the FLSA rights."[114] A "'but-for' cause

---

[112] *Id.*

[113] *Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1342-43 (11th Cir. 2000) (internal quotations and citations omitted).

[114] *Id.* at 1343 (quoting *Reich*, 50 F.3d at 965-66). There is some disagreement as to whether the "but-for" standard applies to FLSA retaliation cases. Although the Circuit in *Reich* used the "but-for" terminology in a FLSA retaliation case, it equated the standard to the "motivating factor" test. However, in *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338 (2013), the Supreme Court distinguished the "motivating factor" causation standard as a "lessened causation standard" and concluded that Title VII retaliation claims require proof of "but-for" causation because (1) Title VII's anti-retaliation provision prohibits taking an adverse employment action "because" of certain criteria; (2) in *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009), the Court interpreted the same language in the ADEA, 29 U.S.C. § 623(a), as requiring proof of but-for causation; and (3) there was no "meaningful textual difference" between those two statutes. 570 U.S. at 348-52. While the Eleventh Circuit recently applied *Gross* and *Nassar*'s "but-for" standard to the False Claims Act's retaliation provision (31 U.S.C. § 3730(h)(1)), *see Nesbitt v. Candler County, Ga.*, 945 F.3d 1355, 1359-60 (11th Cir. 2020), no binding precedent has extended it to the FLSA. Nonetheless, other lower courts have done so, noting that, like Title VII, the ADEA, and the False Claims Act, the FLSA's anti-retaliation statute, 29 U.S.C. § 215(a)(3), prohibits an employer from terminating or discriminating against an employee "because" such employee engaged in protected activity. *See Moakler v. Furkids, Inc.*, 374 F. Supp. 3d 1306, 1318 n. 4 (N.D. Ga. 2019); *Kubiak v. S.W. Cowboy,*

requires a closer link than mere proximate causation; it requires that the proscribed animus have a determinative influence on the employer's adverse decision."[115]

Stewart testified that he repeatedly complained about the unlawful reduction of his hours, and "Chief Mapp repeatedly chastised me and threatened to terminate my employment if I continued to complain. For instance, Chief Mapp, on several occasions, told me, 'If you don't keep your mouth shut, your mouth is going to get you fired.'"[116] From this evidence, a jury could find that Stewart was terminated because of his complaints regarding overtime compensation. Thus, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for Stewart's separation from employment.

### ii.     Legitimate Reason for Termination and Pretext

The City has proffered a legitimate, non-retaliatory reason for terminating Stewart—Stewart's racist remarks. The City's burden to articulate a non-retaliatory reason for terminating Stewart is one of production, not of persuasion.[117] This burden "involves no credibility determination" and only requires the employer to state "'a clear

---

*Inc.*, 164 F. Supp. 3d 1344, 1365 n. 30 (M.D. Fla. 2016). Other courts, however, have declined to do so, citing a dearth of Eleventh Circuit precedent on the issue. *See Smith v. Metro Mech., Inc.*, No. 2:16-CV-1107-KOB, 2018 WL 1064410, at *6 (N.D. Ala. Feb. 27, 2018). This Court finds the reasoning for application of the "but-for" standard to be more persuasive.

[115] *Sims v. MVM, Inc.*, 704 F.3d 1327, 1335-36 (11th Cir. 2013).

[116] Stewart Aff. ¶¶ 32-33.

[117] *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 769 (11th Cir. 2005).

and reasonably specific' non-discriminatory basis for its actions."[118] Terminating an employee for racist remarks satisfies this "exceedingly light" burden.[119]

Thus, the burden shifts back to Stewart to produce evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision."[120] A plaintiff "may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."[121] However, an employee is "not allowed to recast an employer's proffered [nonretaliatory] reasons or substitute his business judgment for that of the employer."[122] Rather, "an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason."[123] "[A] plaintiff is entitled to survive summary judgment, and judgment as a matter of law, if there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged actions."[124]

---

[118] *Id.* at 769-70 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981)).
[119] *See Smith v. Horner*, 839 F.2d 1530, 1537 (11th Cir. 1988) (describing the employer's burden at this stage as "exceedingly light.").
[120] *Chapman*, 229 F.3d at 1024 (internal quotation marks and citation omitted).
[121] *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005).
[122] *Chapman*, 229 F.3d at 1030.
[123] *Id.*
[124] *Latham v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999) (internal citation omitted).

Stewart presents sufficient evidence of pretext. The Court agrees with the City that Stewart's denial regarding the racial remarks are simply quarrels with Chief Mapp's wisdom and insufficient to establish pretext. Stewart's evidence of pretext, however, is not limited to his denials of making racist remarks. Stewart testified that Chief Mapp threatened to terminate him if he continued to complain about overtime. Moreover, Stewart testified that he received a verbal reprimand for his misconduct on August 10, 2016, but a written Disciplinary Action form appeared in his personnel file when he requested to inspect his file after he was terminated. He maintains that he had never seen this form until he requested his file, and the form was placed in his file following his termination. Accepting Stewart's contentions as true, as this Court must, a jury could reasonably determine that the City added a falsified disciplinary form to hide its true reason for terminating Stewart – his complaints about overtime.

## II.    State Law Claims

### A.  Breach of Contract

Stewart contends that Postell had apparent authority to bind the City to their agreement that Stewart would voluntarily resign and not pursue legal action in exchange for two weeks' pay and reporting his separation from employment to POST as voluntarily, and the City breached that agreement. The City argues that any agreement Stewart purportedly made with Postell was ultra vires and therefore void because it does not comport with the City's Charter. The Court agrees.

"[A] contract is ultra vires and an 'absolute nullity' if a local government enters it 'in abrogation of its delegated power or in excess of its authority to enter contracts,' but [] a contract may not be completely ineffective if it had merely been 'imperfectly or irregularly executed.'"[125] "[T]he City's charter, enacted by the General Assembly, sets forth the parameters of the City's authority to take official action, including its ability to enter into contracts."[126] In *H.G. Brown Family L.P. v. City of Villa Rica*, the Mayor of Villa Rica, along with two city council members, executed a contract to purchase a right-of0way from H.G. Brown.[127] The city's charter, however, required contracts to be approved by the city council, and the three officers in question did not constitute a quorum under the charter. The Georgia supreme court also noted that the contract had been presented to the city attorney, another charter requirement.[128] The court held that H.G. Brown's contract was ultra vires, attaching controlling significance to the fact that the city council had not approved the contract: "The officer, body, or board duly authorized must act on behalf of the municipality, otherwise a valid contract cannot be created. . . . [T]he governing body . . . must act at a legal meeting and as a board, since the individual members acting singly have no authority to bind the municipality."[129]

---

[125] *City of Baldwin v. Woodard & Curran, Inc.*, 292 Ga. 19, 24 (2013) (quoting *H.G. Brown Family L.P. v. City of Villa Rica,* 278 Ga. 819, 820 (2005)).
[126] *Id.*
[127] 278 Ga. 819 (2005).
[128] *Id.*
[129] *Id.* at 821 (internal quotation marks and citation omitted).

Here, any contract between Stewart and Postell was not in accordance with the City's charter. The City's charter provides in pertinent part that

> [no] contract with the city shall be binding on the city unless:
> (a) It is in writing;
> (b) It is drawn by or submitted to and reviewed by the city attorney and, as a matter of course, is signed by him or her to indicate such drafting or reviews; and
> (c) It is approved or authorized by the city council and such approval is entered in the city council journal of minutes required under this Charter.[130]

It is undisputed that the city attorney did not draft or review the contract between Stewart and Postell, nor did the city council approve or authorize the contract. Stewart's argument that Postell's apparent authority to enter into the contract is unavailing, as the record contains no evidence that anyone at the City gave him any such authority. Moreover, the Court finds no merit in Stewart's procedural irregularity argument. No binding contract existed between Stewart and the City; thus, Stewart cannot maintain his breach of contract claim.

### B.  Intentional Infliction of Emotional Distress

---

[130] Postell Decl., Ex. B [Doc. 15-4, p. 8]. Stewart argues the Court cannot consider the City Charter because Defendant did not attach the entire Charter to Postell's declaration. However, this Court can take judicial notice of the City's Charter as a matter of public record, found online at https://library.municode.com/ga/Greensboro/codes/code_of_ordinances. *See Rowan v. City of Avon Park*, No. 2:12-CV-14077-KMM, 2012 WL 2872300 at *1, n.3 (S.D. Fla. July 12, 2012) (taking judicial notice of city's charter); *Newcomb v. Brennan*, 558 F.2d 825, 829 (7th Cir. 1997) (noting that a "court may take judicial notice of facts of 'common knowledge,'" which include "matters of public record such as state statutes, city charters and city ordinances"); Fed. R. Evid. 201(f) (providing that judicial notice of adjudicative facts may be taken at any stage in a proceeding).

To prevail on a claim for intentional infliction of emotional distress, a plaintiff's burden is "stringent."[131] He must demonstrate that:

> (1) the conduct giving rise to the claim was intentional or reckless; (2) the conduct was extreme and outrageous; (3) the conduct caused emotional distress; and (4) the emotional distress was severe. The defendant's conduct must be so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Whether a claim rises to the requisite level of outrageousness and egregiousness to sustain a claim for intentional infliction of emotional distress is a question of law.[132]

"The rule of thumb in determining whether the conduct complained of was sufficiently extreme and outrageous is whether the recitation of the facts to an average member of the community would arouse her resentment against the defendant so that she would exclaim[,] 'Outrageous!'"[133] Factors to consider include "the existence of a relationship in which one person has control over another, the actor's awareness of the victim's particular susceptibility, and the severity of the resultant harm."[134] The workplace setting is a factor, as well. "The opportunity for commission of the tort is more frequently presented in the workplace than in casual circumstances involving temporary relationships."[135] This is because "by its very nature, [the workplace] provides an

---

[131] *Ingram v. JIK Realty Co.*, 199 Ga. App. 202, 204 (1991).

[132] *Steed v. Fed. Nat. Mortg. Corp.*, 301 Ga. App. 801, 810, 689 S.E.2d 843, 851–52 (2009) (citation omitted).

[133] *Wilcher v. Confederate Packaging, Inc.*, 287 Ga. App. 451, 453, 651 S.E.2d 790, 792 (2007) (internal quotation marks and citation omitted).

[134] *Trimble v. Circuit City Stores, Inc.*, 220 Ga. App. 498, 499–500, 469 S.E.2d 776, 778 (1996) (citations omitted).

[135] *Coleman v. Hous. Auth. of Americus*, 191 Ga. App. 166, 169, 381 S.E.2d 303, 306 (1989); *see also Hendrix v. Phillips*, 207 Ga. App. 394, 395, 428 S.E.2d 91, 93 (1993) ("The court has recognized that the existence of a special relationship in which one person has control over another, as in the employer-employee

environment more prone to such occurrences because it provides a captive victim who may fear reprisal for complaining, so that the injury is exacerbated by repetition, and it presents a hierarchy of structured relationships which cannot easily be avoided."[136] Even where an employment relationship exists, however, "major outrage in the language or conduct complained of is essential to the tort."[137]

Stewart fails to show any evidence of conduct that could be described as extreme, outrageous, atrocious, intolerable, or beyond the bounds of decency. Stewart's intentional infliction of emotional distress claim is based on the same facts supporting his FLSA claims. "Employment-related activities by themselves are insufficient to establish that conduct is extreme and outrageous."[138] Even accepting all of Stewart's allegations as

---

relationship, may produce a character of outrageousness that otherwise might not exist." (internal quotation marks and citations omitted)).

[136] *Coleman*, 191 Ga. App. at 169, 381 S.E.2d at 306.

[137] *Bridges v. Winn-Dixie Atlanta, Inc.*, 176 Ga. App. 227, 230 (1985).

[138] *Anderson v. Dunbar Armored, Inc.*, 678 F. Supp. 2d 1280, 1331 (N.D. Ga. 2009) (citing *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1229 (11th Cir.1993) ("Georgia courts have held that an employer's termination of an employee-however stressful to the employee-generally is not extreme and outrageous conduct"); *Jarrard v. United Parcel Serv., Inc.*, 242 Ga.App. 58, 59–62, 529 S.E.2d 144, 147–49 (2000) (no intentional infliction of emotional distress claim where supervisor insisted on giving "stinging" performance evaluation to employee on day employee returned from a six week leave for psychiatric care even though employee cried and begged supervisor to stop the evaluation and where supervisor "smirked" at the employee and threatened him with termination, causing the employee to have a mental breakdown); *Mears v. Gulfstream Aerospace Corp.*, 225 Ga.App. 636, 639, 484 S.E.2d 659, 664 (1997) (Termination of employee after her short term disability benefits ran out and she was unable to return to work was not the type of outrageous conduct necessary to support claim for intentional infliction of emotional distress.); *Bowers v. Estep*, 204 Ga.App. 615, 420 S.E.2d 336, 337–39 (1992) (no intentional infliction of emotional distress claim where supervisor knew of the plaintiff's emotional conditions and "intentionally harassed, threatened, intimidated and belittled him and maliciously changed conditions of his job, causing him to take a leave of absence ... and be admitted to a psychiatric clinic."); *Fox v. Ravinia Club, Inc.*, 202 Ga. App. 260, 414 S.E.2d 243 (1991) (finding no outrageous conduct where plaintiff's supervisor spoke to her in a "hostile, intimidating and abusive manner" and gave her false reasons for termination); *see also Robinson v. United Parcel Service, Inc.*, No. 1:06–CV–2601–RLV, 2007 WL 3484743, *7 (N.D. Ga. Nov. 14, 2007) ("Negative performance evaluations, demanding business practices, and termination are recognized as common

true, Chief Mapp's alleged conduct simply does not rise to the level of severity necessary to sustain a claim for intentional infliction of emotional distress under Georgia law.[139]

## C. Negligent Hiring, Supervision, and Retention

Under Georgia law, "a defendant employer has a duty to exercise ordinary care not to hire or retain an employee the employer knew or should have known posed a risk of harm to others where it is reasonably foreseeable from the employee's 'tendencies' or propensities that the employee could cause the type of harm sustained by the plaintiff."[140] "[L]iability for negligent hiring or retention requires evidence that the employer knew or should have known of the employee's propensity to engage in the type of conduct that caused the plaintiff's injury."[141]

A claim for negligent hiring, retention, or supervision arises under Georgia law when an employer negligently hires, retains, or supervises an employee and that

---

aspects of being employed."); *Pierr v. Cingular Wireless LLCi,* 397 F. Supp. 2d 1364, 1381–82 (N.D. Ga. 2005) ("Georgia law does not consider adverse employment actions "extreme or outrageous.")).

[139] *See, e.g., Yarbray v. Southern Bell Tel. & Tel. Co.,* 261 Ga. 703, 706 (1991) (conduct sufficient to support claim for intentional infliction of emotional distress where the employer "deliberately set out to retaliate against [the employee], and to punish her for ignoring its lawyer's admonitions and testifying against the employer, which retaliation included subjecting her to abuse by her supervisor and causing her severe emotion pain[.]"); *Kimsey v. Akstein,* 408 F. Supp. 2d 1281, 1288-89 (N.D. Ga. 2005) (no intentional infliction of emotional distress where employee alleged doctor touched her breasts on two occasions and engaged in offensive touching on other occasions).

[140] *Tomczyk v. Jocks & Jills Rests., LLC,* 198 F. App'x 804, 815 (11th Cir. 2006) (citing *Munroe v. Universal Health Servs., Inc.,* 277 Ga. 861 (2004)).

[141] *Middlebrooks v. Hillcrest Foods, Inc.,* 256 F.3d 1241 (11th Cir. 2001) (citing *Alpharetta First United Methodist Church v. Stewart,* 221 Ga. App. 748 (1996).

employee subsequently harms the plaintiff.[142] To establish such a claim, a plaintiff must allege and ultimately prove that the employer knew or should have known of an employee's tendencies to engage in certain behavior relevant to the injuries allegedly incurred by the plaintiff.[143] Moreover, there must also be an underlying state law tort alleged that forms the basis of the injury against the plaintiff, because negligent retention is a "derivative" claim that can only survive to the extent that the underlying state tort claim survives.[144] Because it must be a state tort claim, a federal FLSA claim will not support a claim under Georgia law for negligent supervision and retention.[145] Thus, the City is entitled to summary judgment.

## CONCLUSION

---

[142] *See Farrell v. Time Serv., Inc.*, 178 F. Supp. 2d 1295, 1300 (N.D. Ga. 2001); *see also* O.C.G.A. § 34-7-20 (an "employer is bound to exercise ordinary care in the selection of employees and not to retain them after knowledge of incompetency").

[143] *Id.; see also Leo v. Waffle House, Inc.*, 298 Ga. App. 838, 841 (2009); *H.J. Russell & Co. v. Jones*, 250 Ga. App. 28, 30 (2001).

[144] *See, e.g., Metro. Atlanta Rapid Transit Auth. v. Mosley*, 280 Ga. App. 486, 489 (2006) ("*MARTA*"); *Phinazee v. Interstate Nationalease*, 237 Ga. App. 39, 41 (1999).

[145] *See Canty v. Fry's Elecs., Inc.*, 736 F. Supp. 2d 1352, 1379 (N.D. Ga. 2010) ("There is no distinct tort in Georgia law for harassment, retaliation or discrimination."); *Orquiola v. Nat'l City Mortg.*, 510 F. Supp. 2d 1134, 1140 (N.D. Ga. 2007) ("Like there is no distinct tort in Georgia law for 'sexual harassment,' there is no separate tort under Georgia law for 'retaliation.' Georgia courts have described negligent retention as a 'derivative' claim thus requiring an underlying tort of which Plaintiff has none in state law."); *Alford v. Cosmyl, Inc.*, 209 F. Supp. 2d 1361, 1372 (M.D. Ga. 2002) (granting summary judgment for defendant on negligent supervision and retention claims that were based on employees' alleged discrimination and retaliation of the plaintiffs. "Plaintiffs essentially attempt to create a state law negligence cause of action for discrimination in employment. Acceptance of Plaintiffs' creative legal theory would result in making virtually every employment discrimination claim actionable under state law negligence principles. If the State of Georgia desires or intends to provide its citizens with a state law remedy for employment discrimination, it has the means to do so through legislation enacted by the Georgia General Assembly. Absent a statutory or clear common law duty, this Court has no authority to abandon judicial restraint and create a new state law cause of action for employment discrimination.").

For the reasons set forth above, the Court **HEREBY GRANTS IN PART** and **DENIES IN PART** the City's Motion for Summary Judgment [Doc. 15]. Specifically, the Court **DENIES** summary judgment for the City on Stewart's claims for failure to pay overtime and retaliation under the FLSA, and **GRANTS** summary judgment for the City on Stewart's state law claims for breach of contract; intentional infliction of emotional distress; and negligent hiring, supervision, and retention.

**SO ORDERED,** this 31st day of March, 2020.

<u>S/ C. Ashley Royal</u>
C. ASHLEY ROYAL, SENIOR JUDGE
UNITED STATES DISTRICT COURT